# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| RUDOLPH FALCIANI, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. N18C-03-199 CLS |
| ELIZABETH V. ZINSZER, | ) | |
| SHERREE J. BEDELL, and | ) | |
| STEPHEN ZINSZER, | ) | |
| | ) | |
| Defendants. | ) | |

Date Decided: October 29, 2019

## MEMORANDUM OPINION

Decision after Bench Trial
**Verdict for Plaintiff in part.**
**Verdict for Defendants in part.**


Douglas A. Shachtman, Esquire, The Shachtman Law Firm, Wilmington, DE, Attorney for Plaintiff.

Donald L. Gouge, Jr., Esquire, Donald L. Gouge Jr., LLC, Wilmington, DE, Attorney for Defendants.


**SCOTT, J.**

1

## I. INTRODUCTION

This is the Court's decision following a one-day bench trial relating to certain disputes arising from an alleged contract for the sale of land between Rudolph Falciani ("Plaintiff" or "Buyer") and Elizabeth Zinszer, Sherree Bedell, and Steven Zinszer (collectively "Defendants" or "Sellers").

## II. FINDINGS OF FACT

The Court held a Replevin Hearing in this case on June 19, 2018. The Court held a one-day bench trial for this case on April 24, 2019. The facts before the Court were established in both proceedings.

Plaintiff and Defendant Steven Zinszer became friends during their workdays at Booths Corner Farmer's Market in Boothwyn, Pennsylvania, where each sold items from a booth. One day in May or June 2016, Plaintiff learned from Mr. Zinszer that his mother, Defendant Elizabeth Zinszer, intended to sell her home at 34282 Central Avenue, Frankford, Delaware ("Frankford Property"). Plaintiff expressed interest in purchasing the Frankford Property. Plaintiff eventually toured the Frankford Property in the presence of Mr. Zinszer, Ms. Zinszer, and Defendant Sheree Bedell.

In May or early June 2016, Defendants agreed to sell the Frankford Property to Plaintiff for $375,000. This agreement was made orally. Plaintiff made an initial down payment of about $120,000 cash on June 14, 2016. Plaintiff and Ms. Zinszer

2

signed a partial payment receipt acknowledging this down payment on that same day. The partial payment receipt indicated the Frankford Property was being sold "as is" for a total price of $375,000.[1] This receipt reflected an outstanding balance of $255,000.

A second payment drawn from Plaintiff's then-girlfriend, Nancy Hendrix, in the amount of $68,000 was made on July 26, 2016. Plaintiff and Ms. Zinszer also signed a partial payment receipt acknowledging this second down payment. This second partial payment receipt is identical to the first receipt with the exception of the indicated total price of the home being listed as $275,000 and the outstanding balance being written as $187,000.

As part of the agreement for the sale of the Frankford Property, Plaintiff agreed to maintain the grass of the Frankford Property. At some point in time after the first down payment, Mr. Zinszer granted Plaintiff permission to store a lawn mower in half of the garage of the Frankford Property. Plaintiff proceeded to move several items of personal property from his home in Pennsylvania to the Frankford Property. To move items from his home in Pennsylvania to the Frankford Property, Plaintiff made several trips using a pickup truck, a utility trailer, and a container style

---

[1] This first receipt incorrectly listed the address of the Frankford Property as 35282 Central Avenue. The typographical error has no bearing on the Court's decision and has been corrected by evidence proffered by Defendants and accepted by Plaintiff.

moving "pod." Plaintiff placed his personal property in the home as well as in the entire garage of the Frankford Property.

Plaintiff also made changes to the Frankford Property. Plaintiff installed real hardwood flooring in several rooms, tile flooring in some areas, and painted the walls. To complete these projects, Plaintiff removed carpet from the home and took down wallpaper. These alterations were not part of the agreement for the sale of the Frankford Property.

Ms. Bedell and Ms. Zinszer visited the Frankford Property in May 2017 and discovered the large number of items Plaintiff had stored therein. Plaintiff and Defendants had not gone to settlement on the property at this point in time. On May 15, 2017, Ms. Bedell sent a letter to Plaintiff ("May 15 Letter") on behalf of Ms. Zinszer and demanded Plaintiff contact Defendants within seven days and complete the sale within 30 days. The May 15 Letter also asked Plaintiff not to access the Frankford Property until the issues could be resolved. The Certified Mail receipt for the May 15 Letter shows Ms. Hendrix signed for this letter on May 17, 2017.

A telephone conversation took place between Ms. Hendrix and Ms. Bedell on May 20, 2017. Ms. Hendrix informed Ms. Bedell that Plaintiff was in the process of obtaining a mortgage for the remainder of the purchase price on the Frankford Property. Plaintiff was to provide Defendants with proof of this mortgage within the next few days. Plaintiff did not provide such proof.

On May 25, 2017, Ms. Bedell sent another letter to Plaintiff ("May 25 Letter") on behalf of Ms. Zinszer and demanded Plaintiff remove his personal property from the Frankford Property on or before June 12, 2017. The May 25 Letter informed Plaintiff that he would need to make an appointment with Mr. Zinszer to access the Frankford Property and retrieve his personal property. The May 25 Letter also stated that Defendants considered the sale of the property to have failed. The Certified Mail receipt shows Ms. Hendrix signed for this letter on June 12, 2017.

On May 26, 2017, a telephone conversation took place between Ms. Hendrix and Ms. Bedell. Ms. Hendrix informed Ms. Bedell that she and Plaintiff still planned to move into the Frankford Property. Ms. Bedell informed Ms. Hendrix that Plaintiff could not move into the home because he had not paid the full purchase price. Ms. Bedell also told Ms. Hendrix that Plaintiff needed to remove his personal property from the Frankford Property on or before June 12, 2017. Because this phone conversation soon became heated, Ms. Bedell sent a third letter to Plaintiff on May 26, 2017 ("May 26 Letter") on behalf of Ms. Zinszer. The May 26 Letter is identical to the May 25 Letter. The Certified Mail receipt shows Ms. Hendrix signed for the May 26 Letter on June 12, 2017.

Plaintiff did not retrieve his personal property from the Frankford Property on or before June 12, 2017. Defendants began disposing of Plaintiff's personal property on June 17, 2017. Defendants used dumpsters to dispose of Plaintiff's property. On

5

June 20, 2017, Plaintiff obtained a moving truck to retrieve his personal property. Plaintiff contacted Mr. Zinszer about retrieving his personal property on June 25, 2017.

### III. PARTIES' CONTENTIONS

On March 22, 2018, Plaintiff filed the instant action. Plaintiff alleges the following claims against Defendants: Breach of Contract, Conversion, Replevin, Malicious Prosecution, and Unjust Enrichment. Plaintiff asks this Court to award damages in the amount of his down payments, the value of his converted personal property, and the cost of improvements. This Court denied Plaintiff's action for replevin on July 31, 2018.[2] Plaintiff presented no evidence at trial in support of his malicious prosecution claim.

Defendants initially proceeded *pro se* in the instant action. Defendants obtained counsel for this matter on October 8, 2018. Counsel for Defendants then filed an amended answer and a counterclaim. Defendants counterclaimed against Plaintiff for Breach of Contract. Defendants ask this Court to deny Plaintiff's claims and allow Ms. Zinszer to retain Plaintiff's down payments.

### IV. DISCUSSION

The primary issues before the Court are: (1) whether the oral agreement between the parties created a valid, enforceable contract for the sale of land; (2) if

---

[2] *Falciani v. Zinszer*, 2018 WL 3654903 (Del. Super. July 31, 2018).

so, what are the consequences of Plaintiff's breach of that contract; (3) whether Defendant has been unjustly enriched by Plaintiff's conduct; and (4) whether Defendant converted Plaintiff's personal property.

## A. Contract Formation

Under Delaware's Statute of Frauds, a contract for the sale of land must be in writing and signed by the party to be charged in order to be enforceable in a court of law or equity.[3] An exception to the Statute of Frauds exists when there is evidence of actual part performance of an oral agreement.[4] "Part performance may be deemed to take a contract out of the provisions of the Statute of Frauds on the theory that acts of performance, even if incomplete, constitute substantial evidence that a contract actually exists."[5] To apply the part performance exception to the Statute of Frauds, the performance must be solely attributed to the oral agreement.[6] The acts which constitute part performance must be unequivocal and "must be of such a character that they can be naturally and reasonably accounted for in no other way than by the existence of some contract."[7]

---

[3] 6 *Del. C.* § 2714(a).
[4] *Quillen v. Sayers*, 482 A.2d 744, 747 (Del. 1984); *Skyways Motor Lodge Corp. v. Delaware River and Bay Authority*, 2019 WL 2364320, at *5 (Del. Ch. May 31, 2019); *Sunstar Ventures, LLC v. Tigani*, 2009 WL 1231246, at *5 (Del. Super. Apr. 30, 2009).
[5] *Quillen*, 482 A.2d at 747.
[6] *Skyways Motor Lodge Corp.*, 2019 WL 2364320, at *5.
[7] *Id.*

7

The part performance exception to the Statute of Frauds applies here. Plaintiff paid Defendants a total of about $188,000 in cash. Plaintiff also began making alterations to the Frankford Property and storing items therein. No other reason has been given as to why Plaintiff would pay Defendants that amount of money. Indeed, both parties agree that Plaintiff paid this money to purchase the Frankford Property.[8] Therefore, Plaintiff's partial performance of the contract for the sale of land removes this contract from the restrictions of the Statute of Frauds.

A valid contract exists when (1) the parties intended that the contract would bind them, (2) the terms of the contract are sufficiently definite, and (3) the parties exchanged legal consideration.[9] It is evident that both Plaintiff and Defendants intended to be bound to the contract. Defendants offered to sell the Frankford Property to Plaintiff for $375,000. Plaintiff accepted Defendants' offer and subsequently made the first down payment of about $120,000. While making this first payment, Plaintiff stated that there was "no turning back now."[10] Additionally, the parties exchanged legal consideration. Consideration can be the exchange of

---

[8] Pl.'s Post-trial Proposed Findings of Fact ¶ 17; Defs.' Am. Answer, Affirmative Defenses and Countercl. to Pl.'s Compl. ¶¶ 1–2.
[9] *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010); *SARN Energy LLC v. Tatra Defense Vehicle*, 2018 WL 5733385, at *5 (Del. Super. Oct. 31, 2018).
[10] Trial Tr. 71:13–16, Apr. 24, 2019.

8

mutual promises.[11] Here, Plaintiff exchanged a promise to buy the Frankford Property for $375,000 for Defendants' promise to sell Plaintiff the Frankford Property for $375,000. Therefore, the record shows that the parties intended to be bound by the contract and that they exchanged legal consideration. The last issue to determine is whether the terms of the contract were sufficiently definite.

"All essential terms of the agreement must be sufficiently definite to establish an enforceable contract."[12] The essential terms of a real estate contract are the price, date of settlement, and the property to be sold.[13] Two of the three essential terms of the contract in the instant case are clear and unambiguous: 1) the property to be sold was located at 34282 Central Ave., Frankford, Delaware; and 2) the purchase price was $375,000. The final essential element, date of settlement, is absent from the contract as formed.

"Where the terms in an agreement are so vague that a court cannot determine the existence of a breach, then the parties have not reached a meeting of the minds, and a court should deny the existence of a contract."[14] Here, the date of settlement term was not vague at the time of contract formation; rather, it was nonexistent. The

---

[11] *Mobil Oil Corp. v. Wroten*, 303 A.2d 698, 701 (Del. Ch. 1973) ("Where a contract is executory, the promises of each party supply the consideration necessary to support the promises of the other.").
[12] *Pulieri v. Boardwalk Properties, LLC*, 2015 WL 691449, at *6 (Del. Ch. Feb. 18, 2015).
[13] *Walton v. Beale*, 2006 WL 265489, at *5 (Del. Ch. Jan. 30, 2006).
[14] *SARN Energy LLC*, 2018 WL 5733385, at *5.

parties disagree about what settlement date was discussed at the time of Plaintiff's first down payment,[15] but that is not the relevant question. Instead, the relevant question is whether a date for settlement was discussed at the time of the agreement between the parties, which occurred prior to the first down payment.[16] There is nothing in the record showing that a discussion about a settlement date occurred at the time of the parties' agreement.

"Courts have not always required that a real estate contract contain an exact settlement date, but instead have looked at whether the parties' intention as to the timing of the settlement can be determined."[17] The record shows that the parties likely discussed a settlement date at the time of the first down payment.[18] Defendants maintain that the deal was to be done "quickly"—which they define as six months[19]—and Plaintiff maintains that he had a year in which to settle.[20] Based

---

[15] Plaintiff says that there was no discussion of a settlement date, Trial Tr. 11–12, Apr. 24, 2019, or—in the alternative—Plaintiff says that he had one year to settle, Trial Tr. 27:3–7, Apr. 24, 2019. Defendants maintain they told Plaintiff at the time of the first down payment that the deal was for settlement in six months, but that Plaintiff assured them he could complete it in four. Trial Tr. 69:9–22, Apr. 24, 2019.

[16] Replevin Hr'g Tr. 64:11–14 (direct examination of Rudolph Falciani), 106:11–13 (direct examination of Sheree Bedell), June 19, 2018; Trial Tr. 11–12 (direct examination of Rudolph Falciani), 31–32 (cross examination of Rudolph Falciani), 68:8–14 (direct examination of Sheree Bedell), Apr. 24, 2019.

[17] *Morton v. Rogers*, 2018 WL 1023163, at *4 (Del. Ch. Feb. 22, 2018).

[18] Trial Tr. 26–27 (cross examination of Rudolph Falciani), 68–70 (direct examination of Sheree Bedell, Apr. 24, 2019.

[19] Trial Tr. 68–70 (direct examination of Sheree Bedell), Apr. 24, 2019.

[20] Trial Tr. 27:3–10 (cross examination of Rudolph Falciani), Apr. 24, 2019.

on this record, the Court finds that the parties intended to settle at some point in time within one year from May or June 2016.

When no time for performance is specified, the Court will imply a reasonable time in which to perform.[21] What time period is reasonable is a question of fact.[22] As discussed above, both parties agreed that Plaintiff would pay Defendants $375,000 for the Frankford Property. During the negotiation process, Plaintiff did not convey to Defendants that he would need to obtain a mortgage.[23] Nor was there a discussion of a penalty if Plaintiff failed to obtain a mortgage.[24] Plaintiff made the first two down payments on the Frankford Property in cash. Thus, everything in the record demonstrates that this sale was to be a cash deal.[25]

The Court finds that six months from the date of the agreement is a reasonable time in which to complete the sale of the Frankford Property. The parties did not

---

[21] *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Dec. 29, 2015); *Heckman v. Nero*, 1999 WL 182570, at *4 (Del. Ch. Mar. 26, 1999); *HomeOwners Expert Service, Inc. v. Bobb*, 1977 WL 5315, at *2 (Del. Ch. Mar. 15, 1977).
[22] *Planet Payment, Inc.*, 2015 WL 11120934, at *4.
[23] Trial Tr. 9:12–15 (direct examination of Rudolph Falciani), 27:7–11 (cross examination of Ruldolph Falciani), 70:1–3 (direct examination of Sheree Bedell), Apr. 24, 2019.
[24] Trial Tr. 7–8, Apr. 24, 2019.
[25] Defendants maintain that the deal was a cash deal with "half down and half at settlement." Trial Tr. 90:16–18 (cross examination of Sheree Bedell), Apr. 24, 2019. The fact that Plaintiff's initial down payments to Defendants are a little more than half of the purchase price supports Defendants' assertion. Trial Tr. 13:4–12 (direct examination of Rudolph Falciani), Apr. 24, 2019.

11

agree that Plaintiff would need to obtain a mortgage; in fact, a mortgage was never discussed when the contract formed. Further, Plaintiff's actions indicated to Defendants his willingness and ability to pay large sums of money in cash.[26]

Defendants gave Plaintiff more than six months to complete the transaction. Although Defendants had not heard from Plaintiff about the sale by January of 2017, Defendants allowed Plaintiff more time in which to close. After even more time passed with no word from Plaintiff, Defendants set a hard deadline for closing.[27]

Unless specifically stated in the contract, generally time is not of the essence in a contract for the sale of land.[28] If time is not of the essence, it can be made so by the demand of a party not in default who is ready to perform.[29] On May 15, 2017, Defendants sent Plaintiff a letter by certified mail. In this letter, Defendants informed Plaintiff that he had 30 days to complete the sale and seven days to contact Defendant.[30] Nothing in the record indicates that Defendants were not ready to pass

---

[26] Plaintiff's first down payment was about $120,000 in cash. This payment occurred less than one month after the contract was formed. Plaintiff's second down payment was a cashier's check for $68,000. The second payment occurred one month after the first payment. Trial Tr. 10, 13, Apr. 24, 2019.

[27] Replevin Hr'g Pl.'s Ex. 6 (March 15, 2017 letter from Sheree Bedell to Rudolph Falciani).

[28] *Bryan v. Moore*, 863 A.2d 258, 260 (Del. Ch. 2004).

[29] *Lewes Inv. Co., LLC v. Estate of Graves*, 2013 WL 508486, at *14 (Del. Ch. Feb. 12, 2013).

[30] Replevin Hr'g Pl.'s Ex. 6.

title to the Frankford Property to Plaintiff at this time. Therefore, Defendants' May 15 Letter made time of the essence in the instant sale.

When time becomes of the essence, the time given must be reasonable under the circumstances.[31] In the May 15 Letter, Defendants gave Plaintiff 30 days to complete the sale. Considering the lack of discussion of a mortgage between Plaintiff and Ms. Zinszer at any point before May 2017, Defendants expected Plaintiff to be able to pay the remainder of the purchase price in cash within 30 days, which would have been exactly one year from the date of Plaintiff's first down payment.[32] The Court finds that this additional 30 days, on top of the extra five months Defendants had already allowed Plaintiff to prolong settlement, was reasonable under the circumstances.

### B. Consequences of Plaintiff's Breach

The Court finds Plaintiff breached the contract. Plaintiff received the May 15 letter on May 17, 2017.[33] From May 17th, Plaintiff was on notice that he had seven days in which to contact Defendant and 30 days in which to settle the contract. On May 20, 2017, Plaintiff's fiancé, Nancy Hendrix, called Defendant Sheree Bedell and informed Ms. Bedell that Plaintiff was in the process of obtaining a mortgage.[34]

---

[31] *Tull v. Smith*, 50 A.2d 908, 910 (Del. Ch. 1946).
[32] Thirty days from the date the May 15 Letter was sent is June 14, 2017. Plaintiff made his first down payment on June 14, 2016.
[33] Replevin Hr'g Pl.'s Ex. 6.
[34] Trial Tr. 77–78, Apr. 24, 2019; Defs.' Ex. 1.

13

Ms. Bedell—who was unaware of a mortgage until the May 20th phone call—requested proof of the mortgage; Ms. Hendrix assured Ms. Bedell that Plaintiff would send Defendants proof of the mortgage the next day.[35] Defendants never received proof of the mortgage from Plaintiff or Ms. Hendrix.[36] At that point, it was clear to Defendants that Plaintiff could not pay the remainder of the purchase price.

During the next 30 days, Plaintiff failed to inform Defendants that Plaintiff was still financially able to complete the sale. Plaintiff informed Defendants that he *intended to* move into the Frankford Property, but he did not say that he was *able to* pay the remaining $187,000. Defendants knew that Plaintiff was unable to obtain a mortgage and were unaware of how Plaintiff would pay the remainder of the purchase price.[37] On May 15, 2017, Defendants gave Plaintiff 30 days in which to settle. Plaintiff failed to settle within those 30 days.[38] Accordingly, Plaintiff breached the contract.

---

[35] Trial Tr. 78–79, Apr. 24, 2019.
[36] Trial Tr. 78–79, Apr. 24, 2019.
[37] Trial Tr. 79:7–11, Apr. 24, 2019.
[38] By June 15, 2017, Plaintiff had not gone to settlement. Defendants heard nothing from Plaintiff by June 17, 2017, which is the date Defendants began disposing of Plaintiff's personal property. Defendants did not hear from Plaintiff about picking up his personal property until June 25, 2017. Trial Tr. 113:11–14, Apr. 24, 2019.

14

Normally, specific performance is the appropriate remedy for a breach of a contract for the sale of land because of the unique characteristics of a parcel of land.[39] Specific performance, however, is an equitable remedy. The Superior Court is a court of law and cannot award an equitable remedy. Accordingly, the Court must determine the appropriate amount of money damages.

Contract damages are usually based on the injured party's expectation interest and are intended to give the injured party the "benefit of the bargain" by awarding a sum of money that will, to the extent possible, put the injured party in the same position it would have been in had the contract been performed.[40] In the instant case, the full amount of Defendants' expectation interest is the purchase price of $375,000. Defendants have not requested $375,000 from this Court. Indeed, such a remedy would create a windfall in favor of Defendants because Defendants may still sell the Frankford Property. The Court declines to create such a windfall.[41]

---

[39] *DeMarie v. Neff*, 2005 WL 89403, at *4 (Del. Ch. Jan. 12, 2005); *F.B. Norman Co. v. E.I. Du Pont de Nemours & Co.*, 108 A. 743, 746 (Del. Ch. 1920).
[40] *Council of Unit Owners of Windswept Condo. Ass'n v. Schumm*, 2014 WL 2528657, at *3 (Del. Super. May 19, 2014).
[41] *See Paul v. Deloitte & Touche, LLP*, 974 A.2d 140, 146 (Del. 2009) ("Contract damages are designed to place the injured party in an action for breach of contract in the same place as he would have been if the contract had been performed. Such damages should not act as a windfall." (internal quotation marks omitted)); *Schumm*, 2014 WL 2528657, at *3; *Huggins v. B. Gary Scott, Inc.*, 1992 WL 179482, at *1 (Del. Super. June 25, 1992).

Defendants claim only that they are entitled to retain Plaintiff's deposit of $188,000.[42] Allowing Defendants to retain the entire $188,000 would produce an unjust and unreasonable result.[43] Although Plaintiff breached the contract, there were no provisions in the contract about the down payments being nonrefundable, as in many written contracts for the sale of land. To achieve a just and reasonable result and to avoid creating a windfall in favor of Defendants, the Court orders Defendants to return to Plaintiff $30,000 of the down payments.

## C. Unjust Enrichment

Unjust enrichment is a quasi-contract remedy; it exists when there is no contract between the parties.[44] The Court has already found that there was a contract between the parties for the sale of the Frankford Property. Therefore, Plaintiff cannot claim unjust enrichment for the down payments he made pursuant to the contract for the sale of land.

However, there is nothing in the Plaintiff–Defendants contract for the improvements Plaintiff made to the Frankford Property: namely, the installation of

---

[42] Defs.' Am. Answer, Affirmative Defenses, and Countercl. to Pl.'s Compl. ¶ 47.
[43] *See Shipman v. Hudson*, 1995 WL 109009, at *5 (Del. Super. Feb. 17, 1995); *Council of Unit Owners of Sea Colony East, Phase III Condo. v. Carl M. Freeman Assocs.*, 564 A.2d 357, 363 (Del. Super. Apr. 11, 1989) ("[A] Delaware Court has discretion to employ a flexible approach to damages in order to achieve a just and reasonable result.").
[44] *James v. United Medical LLC*, 2017 WL 1224513, at *7 (Del. Super. Mar. 31, 2017); *Albert v. Alex. Brown Management Servs., Inc.*, 2005 WL 2130607, at *8 (Del. Ch. Aug. 26, 2005).

16

hardwood floors. Because the contract is silent about Plaintiff's alterations, Plaintiff may seek damages under a theory of unjust enrichment. Unjust enrichment is the unjust retention of a benefit to the loss of another. To obtain restitution under an unjust enrichment theory, Plaintiff must show that: 1) Defendants were unjustly enriched; 2) Defendants secured a benefit; and 3) it would be unconscionable to allow them to retain that benefit.[45]

Although Defendants did not give Plaintiff permission to install hardwood floors in the Frankford Property, Defendants did not voice their opposition to the changes when they learned of them in October 2016.[46] Tearing up old carpet and installing hardwood floors is an improvement to the Frankford Property. Defendants now benefit from the subsequent increase in the value of the Frankford Property. Plaintiff suffered a loss by installing hardwood floors in the Frankford Property at his own expense. Therefore, Defendants would be unjustly enriched if Plaintiff did not receive some manner of compensation for the cost of the installation. The Court orders Defendant to pay Plaintiff $5,000 for the installation of the hardwood floors.

### D.  Conversion of Plaintiff's Personal Property

Conversion is a distinct act of "dominion wrongfully exerted over the property of another" in denial of that individual's right to possess the property, or inconsistent

---

[45] *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999).
[46] Replevin Hr'g Tr. 108:7–13, June 19, 2018.

17

with that right.[47] In order to prove conversion, Plaintiff must show: 1) he had an interest in the property; 2) he had a right to possession of the property; and 3) the property was converted.[48] Here, it is not disputed that Plaintiff stored some of his personal property in the Frankford Property.

Although it might have been imprudent for Plaintiff to store so much personal property at the Frankford Property, this did not give Defendants the right to destroy Plaintiff's property. Plaintiff moved personal property over to the Frankford Property in anticipation of moving in.[49] Plaintiff never intended to abandon the property; indeed, Plaintiff rented a moving truck to retrieve his property after Defendants advised him to get his property.[50] Plaintiff had an interest in his personal property and had a right to possess that personal property. Defendants disposed of Plaintiff's property by putting the property into dumpsters.[51] Defendants' actions deprived Plaintiff of his rights and interest in the property. Therefore, Defendants converted Plaintiff's personal property.

---

[47] *Kuroda v. SPJS Holdings, LLC,* 971 A.2d 872, 889 (Del. Ch. 2009) (quoting *Drug, Inc. v. Hunt,* 168 A. 87, 93 (Del. 1933)).

[48] *Gould v. Gould,* 2012 WL 3291850, at *7 (Del. Ch. Aug. 14, 2012).

[49] Replevin Hr'g Tr. 28–31, 70–71, June 19, 2018; Trial Tr. 46–47, Apr. 24, 2019. Although Ms. Hendrix owned some of these items, Plaintiff was in lawful possession of these items due to his cohabitation with Ms. Hendrix.

[50] Replevin Hr'g Tr. 42–43, June 19, 2018; Trial Tr. 60–61, Apr. 24, 2019.

[51] Trial Tr. 81–82, Apr. 24, 2019 (direct examination of Sheree Bedell).

On his Conversion claim, Plaintiff seeks only what he estimates he paid for the property.[52] Plaintiff paid a total of $50,070 for the converted property.[53] After accounting for potential depreciation in value, the Court finds that Plaintiff is entitled to recover $25,000 in damages from Defendants.

## V.  CONCLUSION

For the reasons set forth above, an oral contract for the sale of land existed between the parties. Plaintiff breached this contract by failing to pay the total amount of money owed to Defendants within a reasonable time. Defendants were unjustly enriched by Plaintiff's improvements to the Frankford property, and Defendants converted Plaintiff's personal property. The Court issues a verdict partially in Plaintiff's favor and partially in Defendants' favor. Therefore, it is hereby **ORDERED**:

1. Defendant must pay Plaintiff $5,000 as damages for the cost of installing the hardwood floors.

2. Defendant must pay Plaintiff $25,000 as damages for the value of Plaintiff's converted personal property.

---

[52] Trial Tr. 50–51, Apr. 24, 2019.
[53] The Court bases this number off of the estimates Plaintiff made as to the value of his personal property, Pl.'s Ex. 1, and the list of items Plaintiff verified he took to the Frankford Property, Replevin Hr'g Ex. 1; Replevin Hr'g Tr. 79:5–20, June 19, 2018.

3. Defendant must return $30,000 of the down payments Plaintiff made on the Frankford property.

4. Defendant may keep $158,000 of the down payments Plaintiff made on the Frankford property.

_____
**The Honorable Calvin L. Scott, Jr.**